UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

TMT  BULK CO., LTD. d/b/a TMT BULK
CORPORATION OF PANAMA

Plaintiff,

- against -

TRANSFIELD ER CAPE LTD.,
and TRANSFIELD ER LTD.

Defendants.

-----------------------------------------------------------X



10 CV
ECF CASE

## VERIFIED COMPLAINT

Plaintiff, TMT BULK CO., LTD., d/b/a TMT BULK CORPORATION OF PANAMA (TMT), by and through its attorneys, The Tisdale Law offices LLC, as and for its Verified Complaint against the Defendants, TRANSFIELD ER CAPE LTD. (TEC) and TRANSFIELD ER LTD., (TEL), (collectively "Defendants"), allege upon information and belief as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code §1333.

2.      At all material times to this action, Plaintiff was a foreign company duly organized and operating under foreign law with an office and place of business in Panama.

3.      On information and belief, at all times material hereto, Defendants were and still are business entities organized and existing under the laws of the British Virgin Islands (BVI) with an address in care of a corporate agent Portecullis Trustnet (BVI) Limited, Ellen Skeleton Building, 4th Floor, Road Town, Tortola, British Virgin Islands.

4.      Prior to filing this action, each named Defendant was previously registered to do business in the State of New York.  Such authority has recently been surrendered by each named

1

Defendant and the respective agent for service of process has also been revoked. After further investigation, neither of these Defendants can be found within the Southern District of New York for the purposes of a Rule B attachment. As noted later herein, it is believed that property of the Defendants, namely cash in the hands of JP Morgan Chase Bank, National Association, are present in the district.

5.    On or about January 26, 2007, TMT entered into a Contract of Affreightment (COA) with Defendant, TEC. *See COA, attached as Exhibit 1.*

6.    During the course of the performance of the obligations of this COA, disputes arose between the parties in regard to Defendant, TEC's breach of payment for the last two lifts that took place earlier in 2010 which sums totals $686,039.23. *See Outstanding Freight Statements of Amounts Due, attached as Exhibit 2.*

7.    Despite due demand, Defendant, TEC, has failed to pay the amount do to the Plaintiff under the terms of the COA.

8.    Plaintiff is now preparing to commence arbitration in London, England pursuant to the terms and conditions of the COA.

9.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London arbitration pursuant to English law. As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | |
|---|---|---|
| A. | Principal claim: | $686,039.23 |
| B. | Interest on claims:<br>2 years at 5%, compounded quarterly | $71,681.56 |
| C. | Estimated fees and costs: | $165,000.00 |
| | TOTAL: | $922,720.79 |

10. Upon information and belief, Defendant, TEC, is a captive corporation through which its parent, Defendant, TEL, entered into the subject COA as an alter ego.

11. An action styled Front Carrier Ltd. v. Transfield ER Cape Ltd. and Transfield ER Limited, 07 Civ. 6333 (RJS) was filed in this Court on July 11, 2007.

12. The Plaintiff in that action, Front Carriers Ltd. (Front) subsequently filed a Second Amended Complaint on October 25, 2007 (Docket #66) ("Front Action").

13. The Front Second Amended Complaint alleges, *inter alia*, that Defendants herein, TEC and TEL, share the same website; and on that website both companies "appear to share the same address in Hong Kong", and "appear to share the same telephone network."

14. The Front Second Amended Complaint further alleges, in material part:

> 72. Based on the forgoing circumstances, defendant Transfield ER Cape Ltd. uses defendant Transfield ER Limited as an agent for payment, by which Transfield ER Limited accepts payments on behalf of Transfield ER Cape Ltd. despite Transfield ER Limited having provided no consideration to Transfield ER Cape Ltd. Alternatively, Transfield ER Cape Ltd. and Transfield ER Limited have commingled fund and /or otherwise are failing to observe corporate formalities by allowing Transfield ER Limited to be paid for performances in which Transfield ER Cape Ltd. was a party rendering the consideration for which payment was received.
>
> \*    \*    \*
>
> 76. In sum, it appears that Transfield ER Limited is a company in the Transfield Group that operates out of the public eye and does not appear to conduct any advertised business, yet is designated as the recipient for millions of dollars of charter hire earned by Transfield ER Cape Ltd. (and presumable other Transfield entities) for no apparent reason. Transfield ER Limited is the alter-ego of Transfield ER Cape limited because it dominates and disregards Transfield ER Cape Ltd.'s corporate form to the extent that Transfield ER Cape Ltd.'s business and operations as if the same were its own, or vise versa.

14. Based on the allegations in the Front Second Amended Complaint, Judge Richard J. Sullivan issued an amended Order of Maritime Attachment and Garnishment as to both Transfield ER Cape Ltd. and Transfield ER Limited (Docket #73), Defendants in this matter.

15.    After funds were attached in the Front Action, motions for countersecurity were heard and Escrow Agreement was established between Front, TEC and JP Morgan Chase Bank, National Association ("Chase") whereby Chase agreed to act as escrow agent. *See Escrow Account and statement, attached as Exhibit 3.* Based upon that agreement and pleadings in the Front action, it is understood that TEC (and possibly TEL) have property in this district in the form of cash deposits in the escrow account in excess of $15,000,000.00. *See Exhibit 3.*

16.    While these funds stand as security for the Front claims, if resolved for less than the balance of the escrow, these funds will represent security for Plaintiff's claims in this action. It is also understood that another writ of attachment has also been issued in Jade Navigation S.A. v. Transfield ER Cape Limited, 10 Civ. 4899 (AKH), against these same funds, but it is not presently known whether service of that writ, issued by Judge Hellerstein, has been effected.

17.    The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants now have assets within this District that are subject to the jurisdiction of this Court, held in the hands of garnishee JP Morgan Chase, also within the District which are funds of these Defendants.

18.    The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, property of the Defendant held by garnishee JP Morgan Chase within the District for the purpose of obtaining personal jurisdiction over the Defendant, to compel arbitration and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint, failing which default judgment be entered against it in the sum of **$922,720.79.**

B.     That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Amended Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$922,720.79** belonging to or due to the Defendants, including but not limited to such property as is being held at JP Morgan Chase Bank in the escrow account more fully detailed above, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Verified Complaint;

C.     That pursuant to 9 U.S.C. §§201 et seq. this Court recognize and confirm any arbitration award or judgment in Plaintiff's favor against the Defendants as a judgment of this Court;

D.     That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

E.     That the Plaintiff have such other, further and different relief as the Court deems just, proper and equitable.

Dated: July 2, 2010
    New York, NY

TMT  BULK CO., LTD. d/b/a TMT BULK
CORPORATION OF PANAMA

By: _____
Thomas L. Tisdale (TT 5263)
TISDALE LAW OFFICES LLC
24 West 40th Street, 17th Floor
New York, NY 10018
(212) 354-0025 – phone
(212) 869-0067 – fax
ttisdale@tisdale-law.com

6

## ATTORNEY'S VERIFICATION

State of Connecticut  )
                      )    ss.:    Southport
County of Fairfield   )

1. My name is Thomas L. Tisdale

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am a Partner in the firm of Tisdale Law Offices, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Amended Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    July 2, 2010
          New York, NY


                                        _____
                                        Thomas L. Tisdale

# EXHIBIT 1

# CHARTER PARTY
## Dated 26th January, 2007

| | |
|---|---|
| Owners | :TMT BULK CO., LIMITED |
| Charterers | :TRANSFIELD ER CAPE LTD. BRITISH VIRGIN ISLANDS |
| Performing Vessel | :M.V. "TMT TBN" |
| Loading Port | :Ponta Da Madeira or Tubarao or Sepetiba or GIT or UBU, Brazil |
| Discharging Port | :Options in China |

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

This Charter Party, dated 26th January, 2007 is concluded by and between Transfield ER Cape Limited., British Virgin Islands as Charterers (hereinafter referred to as 'Charterers') and TMT BULK COMPANY LIMITED as Owners (hereinafter referred to as 'Owners').

### WITNESSETH THAT:

This is a Charter Party with Owners for twelve film shipment of IRON ORE from one-two safe berth(s), one safe port Ponta da Madeira, or in Charterers' option one-two safe berth, one safe port Tubarao, or in Charterers' option one-two safe berth, one safe port Sepetiba (which to be renamed as itaguai), or in Charterers' option one-two safe berth, one safe port GIT, or in Charterers option one-two safe berth(s), one safe port UBU

to

one or two safe berth(s) each one safe port Beilun or Majishan or Qingdao or Rizhao or Yantai or Caofeidian or Bayuquan or Dalian or Xingang or Lianyungang, or in Charterers' option one or two safe berth(s) each one safe port Beilun or Majishan or Qingdao or Rizhao and one or two safe berth(s) each one safe port Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal), or in Charterers' option one safe anchorage and one-two safe berth(s) each Shanghai (Luhuashan and Luojing, which to be deemed as one discharging port) or Zhanjiang or Fangcheng, or in Charterers' option one safe anchorage and one-two safe berth(s) Luhuashang and Nantong or Zhangjiagang (Haili Terminal), or in Charterers' option one-two safe berth(s) each one-two safe port(s) Rizhao plus Lanshan, or in Charterers' option one safe anchorage and one-two safe berth(s) Zhanjiang or Fangcheng plus one-two safe berth(s) each Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal).

WHEREAS, Charterers undertake to provide and Owners undertake to transport on the terms and conditions are set forth as follows.

### 1.    Definitions

In this Charter Party, unless otherwise defined, the terms should have following meanings:

1.A. 'Ore' means iron ore in bulk including iron ore concentrates in bulk, and fine, pellets, lump in bulk. Their quality, nature and shipping conditions are within IMO regulation, but always excluding DRI/DRIP/HBI and Sponge Iron Ore.

1.B. 'Dollars' and 'Cents' - means respectively dollars and cents in lawful money of the United States of America.

1.C. "Charter Party cargo" - means cargo of IRON ORE from one-two safe berth(s), one safe port Ponta da Madeira, or in Charterers' option one-two safe berth, one safe port Tubarao, or in Charterers' option one-two safe berth, one safe port Sepetiba (which to be renamed as itaguai), or in Charterers' option one-two safe berth, one safe port GIT, or in Charterers option one-two safe berth(s), one safe port UBU to one or two safe berth(s) each one safe port Beilun or Majishan or Qingdao or Rizhao or Yantai or Caofeidian or Bayuquan or Dalian or Xingang or Lianyungang, or in Charterers' option one or two safe berth(s) one safe port Beilun or Majishan or Qingdao or Rizhao plus

2

one or two safe berth(s) each one safe port Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal), or in Charterers' option one safe anchorage and one-two safe berth(s) each Shanghai (Luhuashan+Luojing, which to be deemed as one discharging port) or Zhanjiang or Fangcheng, or in Charterers' option one safe anchorage and one-two safe berth(s) Luhuashan plus Nantong or Zhangjiagang (Haili Terminal), or in Charterers' option one-two safe berth(s) each one-two safe port(s) Rizhao plus Lanshan, or in Charterers' option one safe anchorage and one-two safe berth(s) Zhanjiang or Fangcheng plus one-two safe berth(s) each Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal),

1.D. "Business Day" – means days excluding Saturdays, Sundays, public holidays and bank holidays in China.

## 2.    Vessels To Be Nominated

TMT Bulk Company Limited – MAXIMUM 18 YEARS.

Owners confirm performing vessel will be either Owners' period in vessel or time Charter-in vessel or voyage Charter-in vessel. And Owners confirm that each vessel nominated will be under Owners' control and the period will be longer than each shipment.

The operating vessel should be Owners controlled or Chartered bulk carriers or ore carriers, or OBO or ore-oil combination carriers, seaworthy, cargo worthy, tight, staunch, and strong suitable for intended voyage and suitable for ordinary grab discharging and shall be in the highest classification for vessels of their age and type with Lloyds, ABS or equivalent. All certificates of the nominated vessel shall be valid till the relevant voyage is complete.

Owners guarantee the vessel is fitted for Iron Ore trade between Brazil and China and comply with all loading and discharging ports regulations and having all valid certificates, etc. All time/costs/expenses incurred in not complying with the regulations to be for Owners' time and account. In case any survey at loading port causing by vessel's age and condition, Notice of Readiness will only be allowed to tender after such survey granted.

## 3.    Shipping Period / Nomination

(1)    one cargo every three months commencing from 1st May, 2007 to 30th April, 2010 fairly even spread.

(2)    latest 35 days before 1st Layday, Charterers to declare the Laycan of 10 days spread. Owners to nominate the intended performing vessel latest 25 days before the 1st layday. Owners option to substitute with final performing vessel latest 15 days before 1st layday. all nominations are subject to shipper/receiver approval within 2 working days after receiving the nomination within Chinese business hours.

## 4.    Cargo Quantity

Total 12 firm shipments, which shall be fairly evenly spread.

Each cargo size 160,000 wet metric ton 10 percent more or less in owners' option of iron ore in bulk including iron ore concentrates in bulk, fine, pellets and lump but always excluded direct reduced iron ore, direct reduced iron ore pellets, hot briquetted iron ore, hot briquetted iron ore pellets and any other of DRI/HBI products, direct reduction iron

ore. Maximum two grades are allowed and cargo shall be loaded, stowed, trimmed, carried and discharged in accordance with IMO's and local requirements and recommendations.

5.    Deviation

Carrying vessel shall sail and arrive at the port of discharging within the normal and reasonable period of time. Any unreasonable deviation or delay is not allowed. It is understood that the vessels are allowed to proceed at economical speed and bunker on usual route.

Owners shall have the responsibility to advise Charterers of accidents occurred as soon as which is known to Owners while vessel being en route. If Owners fail to give such advice in time, any losses and charges incurred therefrom shall be for Owners' account. For the purpose of saving life or property the vessel has liberty to sail with or without pilots to tow and assist vessel in distress and to deviate.

6.    Notices

6.A.    On sailing from the proceeding port, Master and Owner shall inform the Shippers and Shipper's Port Administration at Port of Loading and Charterers, by telex or fax, the expected time of arrival (ETA) of the vessel. Such information shall be updated twelve (12) days, eight (8) days three (3) days, two (2) days and one (1) day before the vessel's expected arrival at loading port, or at any time upon Charterers' request.

6.B.    Master or Owners shall with the 72 hours notice inform Shippers about vessel's cargo plan with following details:
    ⁃    Arrival and departure drafts
    ⁃    Air draft
    ⁃    Ballast quantity on arrival and, if in cargo holds, how distributed
    ⁃    Time required for deballasting after berthing (deballasting time will be accorded to condition when vessel passed nomination by Charterers.)
    ⁃    Loading sequence

Master or Owners shall also state in 72 hours notices, whether a 'Gas Free Certificate' is required or not.

Unless otherwise instructed by Shippers, Master or Owners shall undertake that vessel be presented for berthing with minimum ballast compatible with vessel's seaworthiness.

6.C.    Owners should, on departure of each vessel from the loading port, by cable (including e-mail or fax) inform Charterers of the shipping advice (indicating departure date, ETA China, loaded quantity of each type of ore, estimated arrival draft and hatchwise plan).

6.D.    Master of the vessel or Owners shall give Charterers' agents and Charterers at the discharging port(s) the following 6 notices of ETA of the vessel at the discharging port. The first notice to be given on departure of the vessel loading port, then 20 days, 15 days, 10 days, 72 hours and 24 hours prior to ETA.

The first notice shall indicate the name of the vessel, the type and quantity of cargo and the number of compartments.

7.    Loading Port and Discharging Port

4

7. A. a.  Charterers shall load the cargo and trimmed at one-two safe berth(s), one safe port Ponta da Madeira, or in Charterers' option one-two safe berth, one safe port Tubarao, or in Charterers' option one-two safe berth, one safe port Sepetiba (which to be renamed as Itaguai), or in Charterers' option one-two safe berth, one safe port GIT, or in Charterers option one-two safe berth(s), one safe port UBU, Brazil (for Sepetiba need two freight for 17.1m draft and 18.1 draft respectively), always safely afloat, free of risks, expenses to Owners.

7. A. b.  Upon completion of loading, the vessel shall proceed to

one or two safe berth(s) each one safe port Beilun or Majishan or Qingdao or Rizhao or Yantai or Caofeidian or Bayuquan or Dalian or Xingang or Lianyungang,

or in Charterers' option one or two safe berth(s) one safe port Beilun or Majishan or Qingdao or Rizhao plus one or two safe berth(s) each one safe port Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal),

or in Charterers' option one safe anchorage and one-two safe berth(s) each Shanghai (Luhuashan+Luojing, which to be deemed as one discharging port) or Zhanjiang or Fangcheng,

or in Charterers' option one safe anchorage and one-two safe berth(s) Luhuashan plus Nantong or Zhangjiagang (Haili Terminal),

or in Charterers' option one-two safe berth(s) each one-two safe port(s) Rizhao plus Lanshan,

or in Charterers' option one safe anchorage and one-two safe berth(s) Zhanjiang or Fangcheng plus one-two safe berth(s) each Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal),

always be accessible and safely afloat, free of risks, expenses to Owners.

8.     ## Demurrage and Despatch Clause

Demurrage and despatch shall be calculated on the basis of the statement of facts made by Agents at loading port entrusted by Owners and mutually confirmed by Master and Loading or Discharging Port Authority.

Laytime is non-reversible between loading port and discharging port(s)

8.A.    Loading Port

Laytime at the loading port is non-reversible.

Loading rate as per scale terms:

At Tubarao / Ponta da Madeira: 40 hours for 1st 120,000 wet metric tons and 1 hour or prorata for each 5,000 wet metric tons exceeding 120,000 metric tons turn time 12 hours unless sooner commenced actual time used to count

At GIT: 55,000 metric tons per weather working day Sunday and Holiday included with

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

12hrs turn time unless sooner commenced actual time used to count

At Sepetiba: 50,000 metric tons per weather working day Sunday and Holiday included with 12 hours turn time unless sooner commenced actual time used to count
At Ubu: 60,000 metric tons per weather working day Sunday and Holiday included with 12 hours turn time unless sooner commenced actual time used to count

Demurrage rate: US$55,000 per day or pro rata for part of a day for laytime saved.

Despatch rate: US$27,500 per day or pro rata for part of a day for laytime saved both ends.

8 A. a.    The following time will not count as laytime at loading ports:-

- Time used for sailing from anchorage to wharf till all fastened at the designated loading berth

- Time used for joint inspection

- Time used for draft survey during loading

- Stoppage caused by adjusting ballast (or deballasting)

- Stoppage caused by bad weather (bad whether will be defined according to the declaration of terminal/port authority)

- Stoppage or partial stoppage caused by Owners and partial stoppage as pro rata

- Stoppage caused by Force Majeure

8.B.    Discharging Ports

Discharging rate: 25,000 metric ton per weather working day Sunday and Holiday included with turn time 24 hours each discharging port unless sooner commenced half time to count.

Demurrage rate: US$55,000 per day or pro rata for part of a day for laytime saved.

Dispatch rate: US$27,500 per day or pro rata for part of a day for laytime saved both ends.

8. B. a.    At the discharging ports, Notice of readiness shall be tendered any time day and night Sundays and holidays included, provided the vessel is ready for discharging. Laytime shall commence 24 hours after tendering the Notice of Readiness, unless sooner commenced.

8. B. b.    The following time will not count as laytime at discharging ports:
- Time used for sailing from anchorage to wharf till all fastened at the designated discharging berth
- Time used for shifting between berth to berth
- Time used for draft survey during discharging
- Stoppage caused by adjusting ballast (or deballasting)
- Stoppage caused by bad weather (bad whether will be defined according to the declaration of terminal/port authority)
- Stoppage or partial stoppage caused by Owners and partial stoppage as pro rata.
- Stoppage caused by Force Majeure

8. B. c.    Deleted.

8. B. d.    Deleted.

6

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

8. B. e.   Each vessel has the right, according to the rules and regulations of the port, to sail from discharging port at the first available tide (confirmed by pilot station of the port) after completion of discharging, no matter laytime has been fully used or not.

8. B. f.   The Master has will try to persuade the Port Authority at discharging port to clean the remains of cargoes dropped on deck during discharging. Expense shall not be for Owners' account.

9.   Freight Rates

Tubarao/Qingdao:   USD 27.70 per metric ton F.I.O.S.T. basis 1/1

Freight for other loading and discharging ports to be calculated on the open book basis based on the time charter return by the final performing vessel on Tubarao/Qingdao route at agreed base freight rate to the final discharging port only and no re-positioning advantage/dis-advantage for owners.

Terms for other loading and discharging ports to be advised later. Any alternative load port shall be always within Brazil and any alternative discharging port shall be always within People's Republic of China.

The above freight rate shall be on F.I.O.S.T. basis per metric tons on Bills of Lading quantity (and deadfreight if applicable).

10.   Payment of Freight

10.A.   Freight is to be paid in U.S. Dollars to the bank account designated by Owners.

10.B.   95% of freight payable within 7 banking days after signing/releasing Bills of Lading marked 'freight payable as per c/p' and against owners' original freight invoice. Balance including demurrage(s)/ dispatch(es), if any, to be settled within 30 calendar days after completing discharging and agreeing laytime calculation with support documents.

11.   At Discharging Ports

11.A.   The Cargo on vessel shall be in grabs' reach. Vessel shall be guaranteed suitable for grab discharge. If the cargo is not accessible by means of grabs (including in hatches), the extra expenses over and above the cost of normal grab discharge at discharging ports shall be for Owners' account.

11.B.   Overtime of the crews and officers on board shall be for Owners' account. The vessel shall, if required, supply light for night work as on board free of expenses to Charterers.

12.   Taxes and Dues

Any taxes/dues/wharfages on cargo at loading and discharging ports shall be for Charterers' account. Any taxes/dues/wharfages on vessel/freight/Bill of Lading at loading port shall be for Owners' account.

13. **Stevedoring Damage at Loading and Discharging Ports**

Stevedoring damage, if any at loading port shall be settled between Port Authorities and Owners, but Charterers will lend all possible assistance to Owners.

Stevedoring damage, if any at discharging port, shall be settled between Owners and Port Authorities, but Charterers will lend all possible assistance to Owners in collecting any stevedore damage claims.

14. **Bill of Lading**

The Bill of Lading shall be prepared in accordance with procedures established in the Purchase Charter Party. The Bill of Lading shall be signed by Master or Agents of Owners within 24 hours after completion of loading and awarded to Shippers, freight and all conditions as per this Charter Party. If any of clauses in Bill of Lading is inconsistent with that in this Charter Party, the latter to be taken as governing documents.

15. **Assignment**

Neither Owners or Charterers may assign the Charter Party in whole or in part without prior written consent of the other party. Owners and Charterers shall always remain responsible for the due fulfillment of this Charter Party.

16. **Agent(s)**

Charterers' agents at both loading and discharging port. Agents to be local licensed shipping agency to be nominated which is subject to Owners approval.

Port disbursement: a lumpsum USD 90,000 for port disbursement at one discharging port and USD 120,000 for port disbursements at two discharging ports which will be deducted from initial freight payment without supporting voucher.

Once the agents have been confirmed, Charterers/Owners shall inform Charterers/Owners of their agents at loading and discharging ports in time. Charterers/Owners shall send to Charterers/Owners by express-mail or fax the statement of facts of loading and discharging ports within three (3) business days after the completion discharging.

17. **General Average**

In case of General Average, the same shall be adjusted according to 'YORK-ANTWERP Rules, 1974 amended 1990'. Should the vessel be put into any port or ports due to leakage or damage incurred en route or in any port, the Master and Owners shall inform Charterers without any delay.

18. **War Cancellation Clause**

In the event of war or warlike operation involving either Japan, the United States of America, Great Britain, Russia, P.R. China, Brazil, Norway or the nation under the flag of which any vessel performing under this Charter Party is registered, and this, seriously affects Charterers' or Owners' ability to perform or cost of performing their obligations under this Charter Party, Charterers or Owners may advise the other party, that they wish to cancel this particular voyage.

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

The parties shall then meet within thirty (30) days, to decide whether this Charter Party or any part of it shall be amended, suspended or otherwise dealt with. If no agreement is reached, the Charter Party shall be suspended for ninety (90) days and failing agreement by end of this ninety (90) days extension, the voyage in question shall be canceled. If major war breaks out between any two or more of the above-mentioned countries directly affecting the performing of this Charter Party, both Owners and Charterers shall have the right to cancel this Charter Party.

19.    **Both to Blame Collision Clause**

Clause 23 of ASBATIME 1981 apply to this Charter Party.

20.    **New Jason Clause**

Clause 23 of ASBATIME 1981 apply to this Charter Party.

21.    **Clause Paramount**

All Bills of Lading under the Charter Party shall include the following Clause Paramount:

Hague-Visby Rules 1968 or similar legislation of the nation of destination shall be applicable.

22.    **War Risk**

Clause 16 of Gencon (Revision 1976) shall apply to this Charter Party.

23.    **Strike and Force Majeure Clause**

23.A.    At loading port

The time lost as a result of all or any of the following causes shall not count as laytime and demurrage VIZ.: wars, rebellions, tumults, civil commotions, strikes, insurrections, political disturbances, epidemics and quarantine, riots, lock-out, stoppage of miners, workmen, railway employees, stevedores, seamen or any other workers essential to the working, carriage, delivery, shipment, interruptions of railway transport, whether partial or general, landslips, floods, intervention of sanitary, customs and/or other constituted authorities or other causes beyond Charterers' control preventing cargo preparation, loading or berthing vessel. Once a nominated vessel has been confirmed by Charterers, any loss of vessels schedule incurred by strikes of the miners or company employees is to be considered as Force Majeure.

23.B    At discharging ports

Time lost as a result of all or any of the following causes shall not count as laytime and demurrage, VIZ: war, rebellions, tumults, civil commotions, strikes, insurrections, political disturbances, epidemics, quarantine, riots, lock-out, stoppage of workmen, railway employees, stevedores, seamen or any other workers essential to the working, carriage, delivery, shipment, interruptions of railway transport, whether partial or general, landslips, flood, intervention of sanitary, customs and/or other constituted authorities or other causes beyond Charterers' control preventing cargo preparation, discharging or berthing vessel.

9

If there is a strike or lockout or boycott or Force Majeure condition, affecting the vessel's arrival time, the discharging after the vessel's arrival at or off the port of discharge, vessel's berthing, departure and same has not been settled within 48 hours, Charterers shall have the option of keeping the vessel waiting until such strike or lockout or boycott or Force Majeure condition is at an end against paying demurrage plus bunkers consumed after expiration of the time allowed for discharge, or ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lockout or boycott or Force Majeure.

Such orders shall be given within 48 hours after the Master or Owners have given notice to Charterers of strike or lockout, boycott or Force Majeure condition affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party shall apply and the vessel shall receive the same freight as if she had discharged the cargo at the original port. If the distance of the substituted port exceeds 100 nautical miles, the freight rate on the cargo delivered at the substituted port to be increased in proportion. In any event any expenses and risk causes by strike or lockout or boycott of Master, officers or crews on board the performing vessel always to be for Owners' account.

24.     Arbitration

Any disputes arising under the Charter Party shall be settled amicably. In case no such settlement can be reached, the matter in dispute shall be referred to three persons at LONDON and according to English law. One chosen by each of the parties hereto and the third by the two so chosen; their decision or that of two of them shall be final, and for the purpose of enforcing and award, this agreement may be made a rule of the court, the arbitrators shall be commercial men.

25.     War Risk Insurance

War Risk Insurance, if any, shall be for Owners' account.

26.     Extra Insurance

No overage premium to apply.

27.     Lien

Owners shall have a lien on cargo for ocean freight, deadfreight, demurrage and General Average contribution due under the Charter Party.

28.     Gas Free Clause

Vessel nominated by Owners shall be in gas free condition and shall have a valid Gas Free Certificate on board if required by Shippers prior to presentation at loading port. Owners undertake to submit the vessel to a further gas free inspection by a local independent surveyor at loading port for their own account. Notice of Readiness may be tendered prior to such inspection but if the vessel is found not to be gas free, then laytime not to commence until vessel has obtain Gas Free Certificate. If the vessel has already been berthed at the terminal and then is found not to be gas free by the local surveyor, then the vessel is to vacate the berth immediately and proceed to a safe anchorage for cleaning, all extra expenses for shifting to be for owners' account. Laytime at loading port not to commence to count until the vessel has passed gas free by the local independent surveyor,

even if after the expiry of the turn time. In order to expedite such inspection, Master of combination vessel are recommended to inform the loading port agents 48 hours prior to arrival that a surveyor is required on vessels arrival at or off the terminal.

29.    Language / Communication

It is agreed that the English language will be used in notices letter, Cables and all other means of communications. All relevant communications between Charterers and Owners shall be made through telex, telegram or Fax.

30.    LOI

If the Original Bills of Lading cannot be presented at discharging port, Owners/Master agree to discharge/release the entire cargo without presentation of the Original Bills of Lading only against Charterers letter of indemnity on their letter-head, with their authorized signature in Owners standard P and I form and without bank guarantee or bank endorsement.

Discharge ports shown on the Bills of Lading do not constitute a declaration of discharging port and Charterers have the right to order the vessel to other ports within the terms of this Charter Party against Charterers LOI in Owners' P and I format without bank guarantee/endorsement.

31.    ISM Clause

During the currency of this Charter Party, Owners shall procure that the vessel and "The Company" (as defined by ISM Code) shall comply with the requirement of the ISM Code upon request. The Owners shall provide copy of relevant Documents of Compliance (DOC) and Safety Management Certificates (SMC) to Charterers with vessel nomination. Any loss, damage expenses and delay caused by failure or part of Owners or "The Company" to comply with the ISM Code shall be for Owners' account.

32.    Commission

3.75% address commission payable to Charterers on freight, deadfreight and demurrage, and 1.00% brokerage commission payable to CLARKSON ASIA LTD., on freight, deadfreight and demurrage.

33.    Headings

The headings in the Charter Party are for purpose of convenience only and shall not limit or otherwise affect any of the terms or stipulation hereof.

The Charter Party is written in English and signed as performing Charter Party.

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

IN WITNESS WHEREOF, this Charter Party has been executed by and between Owners and Charterers in Two (2) originals, one of each to be retained by Owners and Charterers.

CHARTERERS:                              OWNERS:

# EXHIBIT 2

# TMT BULK CORPORATION

c/o 6F., No.126, Sec. 1, Jianguo N. Rd.,
Zhongshan District, Taipei City 104, Taiwan

*Today Makes Tomorrow* ™

## BW ATLAS

### FINAL FREIGHT STATEMENT

| | | | |
|---|---|---|---|
| Charterer | : Transfield-er capesize ltd, bvi | Brokers | : Clarkson - Asia |
| CP Date | : 26Jan2007 | Reference | : 0900000005 |
| Voyage No. | : 20090005 | | |
| | | Printed By | : TSHI |

### Summary of Items to Date (USD)

| | | DR | CR |
|---|---|---|---|

**Load: Iron ore at Itaguai, 162,076MT on 23Nov2009 as per BL**

**Discharge: at QingDao**

**Discharge: at NanTong**

**Total BL Quantity : 162,076MT**

**CP Minimum**     **: 160,000.000MT 10% MOLOO**

**Freight on Total loaded**

| Code | Description | DR | CR |
|---|---|---|---|
| 12103 | Plus 95% of Freight : 162,076.000MT @ 31.06 USD/MT | 4,782,376.53 | |
| | Less Address Commission of 3.750% on 100% Freight (USD 5,034,080.56) | | 188,778.02 |
| | Less Total Non-Collect Commission Non-Collect Commission of 1.000% on 100% Freight (USD 5,034,080.56) | | 50,340.81 |
| 12103 | Plus 5% of Freight : 162,076.000MT @ 31.06 USD/MT = Total, less previously invoiced 4,782,376.53 USD | 251,704.03 | |
| 12103 | Plus Demurrage on loading Iron ore at Itaguai | 76,388.89 | |
| | Less Address Commission of 3.750% | | 2,864.58 |
| | Less Non-Collect Commission of 1.000% | | 763.89 |
| 12103 | Less Despatch Iron ore: Discharging QingDao,NanTong | | 10,579.86 |

**Additional Items**

| Code | Description | DR | CR |
|---|---|---|---|
| 11300 | Less Owners Disbursement : Lumpsum PDA voy-20090005 | | 90,000.00 |

### Totals Breakdown

| | DR | CR |
|---|---|---|
| Total Freight Due | 5,034,080.56 | 0.00 |
| Total Despatch/Demurrage Due | 76,388.89 | 10,579.86 |
| Total Miscellaneous Items Raised | 0.00 | 90,000.00 |
| Total Address Commission | 0.00 | 191,642.60 |
| Total Non-Collect Commission | 0.00 | 51,104.70 |
| Total Paid | 0.00 | 4,305,521.38 |
| | | |
| Net credits / debits | 5,110,469.45 | 4,648,848.54 |
| **Balance due to Owners** | | **461,620.91** |

5,110,469.45      5,110,469.45

E. & O. E

**Bank Details**

DNB NOR BANK ASA, SINGAPORE
SWIFT CODE : DNBASGSG
IN FAVOUR OF : DUCKY EXPRESS SHIPPING S.A.
ACCT NO.: 40904002
CORRESPONDENT BANK: BANK OF NEW YORK, NEW YORK, USA.
ABA NO.: 021000018    SWIFT: IRVTUS3N

**TMT BULK CORPORATION**

c/o 10F., No.245, Sec. 1, Dunhua S. Rd., Da'an
Dist., Taipei City 106, Taiwan (R.O.C.)

*Today Makes Tomorrow* ™

Transfield-er capesize ltd, bvi

| | |
|---|---|
| Invoice Date | 27Apr2010 |
| Invoice No | 12772 |
| Our Reference | 0900340006 |

Payment No.  2

---

## FREIGHT INVOICE

| | | | |
|---|---|---|---|
| *C/P Date:* | *26Jan2007* | *Voyage no.:* | 6 |
| *Vessel:* | *Huikanghai* | | |
| *Charterer:* | *Transfield-er capesize ltd, bvi* | | |
| *Fixture Ref.:* | *2010/5* | | |

**Note all values are in USD**

Load: Iron at Ponta Ubu, 146,779MT as per BL
Discharge:  at SheKou
Total BL Quantity : 146,779MT
CP Minimum    : 160,000.000MT 10% MOLOO
Balance of Freight : 146,779.000MT @ 26.99 USD/MT = Total, less previously invoiced      198,078.26
3,763,486.95 USD

| | |
|---|---|
| Demurrage on loading Iron at Ponta Ubu | 49,347.22 |
| Address Commission of 3.750% | -1,850.52 |
| Non-Collect Commission of 1.000% | -493.47 |
| Despatch on discharging Iron at SheKou | -20,663.19 |
| **TOTAL** | **224,418.30** |

E. & O. E.

---

REMITTANCE DATE : 21Apr2010

*Please remit according to the details below quoting Vessel Name, Our Reference and invoice no.*

DNB NOR BANK ASA, SINGAPORE
SWIFT CODE : DNBASGSG
IN FAVOUR OF : DUCKY EXPRESS SHIPPING S.A.
ACCT NO.: 40904002
CORRESPONDENT BANK: BANK OF NEW YORK, NEW YORK, USA.
ABA NO.: 021000018   SWIFT: IRVTUS3N

# EXHIBIT 3

## ESCROW AGREEMENT
### (Basic Three Party Escrow)

THIS ESCROW AGREEMENT (as the same may be amended or modified from time to time pursuant hereto, this "Escrow Agreement") is made and entered into as of January 23, 2008, by and among Front Carriers Ltd., a Liberian corporation ("Party A"), Transfield ER Cape Ltd., a British Virgin Island corporation ("Party B", and together with Party A, sometimes referred to individually as "Party" or collectively as the "Parties"), and JPMorgan Chase Bank, National Association (the "Escrow Agent").

WHEREAS, the Parties have agreed to deposit in escrow certain funds and wish such deposits to be subject to the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.   **Appointment.** The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.   **Funds.** Party A agrees to deposit with the Escrow Agent the sum of $15,101,338 (together those deposits will be referred to as the "Escrow Deposits"). The Escrow Agent shall hold the Escrow Deposits in separate accounts with interest, as earned, posted to each account and, subject to the terms and conditions hereof, shall invest and reinvest the Escrow Deposits and the proceeds thereof (the "Funds") as directed in Section 3.

3.   **Investment of Funds.** (a) During the term of this Escrow Agreement, the Funds shall be invested in a JPMorgan Chase Bank, N.A. money market deposit account ("MMDA") or a successor or similar investment offered by the Escrow Agent, unless otherwise instructed in writing by the Parties and as shall be acceptable to the Escrow Agent. The Escrow Agent will provide compensation on balances in the Funds at a rate determined by the Escrow Agent from time to time. Written investment instructions, if any, shall specify the type and identity of the investments to be purchased and/or sold. The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Escrow Agent or any of its affiliates may receive compensation with respect to any investment directed hereunder including without limitation charging an agency fee in connection with each transaction. The Parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Funds or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment made pursuant to the terms of this Escrow Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Parties to give the Escrow Agent instructions to invest or reinvest the Escrow Funds. The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Escrow Agreement.

(b) Receipt, investment and reinvestment of the Escrow Deposits shall be confirmed by Escrow Agent as soon as practicable by account statement, and any discrepancies in any such account statement shall be noted by Parties to Escrow Agent within thirty (30) calendar days after receipt thereof. Failure to inform Escrow Agent in writing of any discrepancies in any such account statement within said thirty (30) day period shall conclusively be deemed confirmation of such account statement in its entirety.

4.   **Disposition and Termination.** The Funds are to be allocated and distributed in accordance with directions contained in joint written instructions signed by a member of the firm of Holland & Knight LLP listed as an authorized signatory on Schedule 1, on behalf of Party A, and by a member of the firm of Lennon, Murphy & Lennon, LLC, listed as an authorized signatory on Schedule 1, on behalf of Party B. Upon delivery of the Funds by the Escrow Agent, this Escrow Agreement shall terminate, subject to the provisions of Sections 7 and 8.

369922:v2 Form Basic Three Party Escrow Agreement   1
September 2007

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 27 of 40
Case: 10-484    Document: 68-1    Page: 182    04/14/2010    24657    231

A-140

5.    Escrow Agent. (a) The Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Escrow Agreement between the Parties dated December 28, 2007 (the "Underlying Agreement"), nor shall the Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Escrow Agreement. In the event of any conflict between the terms and provisions of this Escrow Agreement, those of the Underlying Agreement, any schedule or exhibit attached to the Escrow Agreement, or any other agreement among the Parties, the terms and conditions of this Escrow Agreement shall control. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper Party or Parties without inquiry and without requiring substantiating evidence of any kind. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Funds, including, without limitation, the Escrow Deposits nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. The Escrow Agent shall have no duty or obligation to make any calculations of any kind hereunder.

(b) The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it except to the extent that a final adjudication of a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to either Party. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys, and shall be liable only for its gross negligence or willful misconduct (as finally adjudicated in a court of competent jurisdiction) in the selection of any such agent or attorney. The Escrow Agent may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in accordance with, or in reliance upon, the advice or opinion of any such counsel, accountants or other skilled persons. In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the Parties which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction. The Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. Anything in this Escrow Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

6.    Succession. (a) The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect. If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. Escrow Agent's sole responsibility after such thirty (30) day notice period expires shall be to hold the Funds (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, or in accordance with the directions of a final order or judgment of a court of competent jurisdiction, at which time of delivery Escrow Agent's obligations hereunder shall cease and terminate, subject to the provisions of Sections 7 and 8 hereunder. The Escrow Agent shall have the right to withhold an amount equal to any amount due and owing to the Escrow Agent, plus any costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with the termination of the Escrow Agreement.

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 28 of 40
Case: 10-484    Document: 68-1    Page: 183    04/14/2010    24657    231

A-141

(b)     Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be the Escrow Agent under this Escrow Agreement without further act.

7.     **Compensation and Reimbursement.** The Parties agree jointly and severally to (a) pay the Escrow Agent upon execution of this Escrow Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing shall be as described in Schedule 2 attached hereto, and (b) pay or reimburse the Escrow Agent upon request for all expenses, disbursements and advances, including, without limitation reasonable attorney's fees and expenses, incurred or made by it in connection with the preparation, negotiation, execution, delivery, performance, modification and termination of this Escrow Agreement. The Parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in, the Funds for the payment of any claim for compensation, expenses and amounts due hereunder. In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Funds for its own account any amounts due to the Escrow Agent under this Section 7. The obligations contained in this Section 7 shall survive the termination of this Escrow Agreement and the resignation, replacement or removal of the Escrow Agent.

8.     **Indemnity.** The Parties shall jointly and severally indemnify, defend and save harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, managers, attorneys, accountants, experts, agents and employees (the "indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, litigation, investigations, costs or expenses (including, without limitation, the fees and expenses of in house or outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Losses") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Escrow Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Escrow Agreement, or as may arise by reason of any act, omission or error of the indemnitee, except in the case of any indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction to have been primarily caused by the gross negligence or willful misconduct of such indemnitee, or (b) its following any instructions or other directions, whether joint or singular, from the Parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The Parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Escrow Agreement. The Parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in, the Funds for the payment of any claim for indemnification, expenses and amounts due hereunder. In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Funds for its own account or for the account of an indemnitee any amounts due to the Escrow Agent or to an indemnitee under this Section 8. The obligations contained in this Section 8 shall survive the termination of this Escrow Agreement and the resignation, replacement or removal of the Escrow Agent.

9.     **Patriot Act Disclosure/Taxpayer Identification Numbers/Tax Reporting.**

(a) **Patriot Act Disclosure.** Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm the Parties identity including without limitation name, address and organizational documents ("identifying information"). The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 29 of 40
Case: 10-484    Document: 68-1    Page: 184    04/14/2010    24657    231

A-142

**(b)  Taxpayer Identification Numbers ("TIN")**

The Parties have provided the Escrow Agent with their respective fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other required documentation. The Parties each represent that its correct TIN assigned by the IRS, or any other taxing authority, is set forth in the delivered forms, as well as in the Substitute IRS Form W-9 set forth on the signature page of this Agreement.

**(c) Tax Reporting**

All interest or other income earned under the Escrow Agreement shall be allocated to each account and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned from the Escrow Deposits by either Party A or Party B as the case may be whether or not said income has been distributed during such year. Any other tax returns required to be filed will be prepared and filed by Party A and/or Party B with the IRS and any other taxing authority as required by law. The Parties acknowledge and agree that Escrow Agent shall have no responsibility for the preparation and/or filing of any income, franchise or any other tax return with respect to the Funds or any income earned by the Escrow Deposits. The Parties further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Deposits shall be paid by Party A and Party B. In the absence of written direction from the Parties, all proceeds of the Funds shall be retained in the Funds and reinvested from time to time by the Escrow Agent as provided in this Agreement. Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

10.    **Notices.** All communications hereunder shall be in writing and shall be deemed to be duly given and received:

(a) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile;

(b) on the next Business Day (as hereinafter defined) if sent by overnight courier; or

(c) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth below or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

| | |
|---|---|
| If to Party A | Holland & Knight LLP<br>195 Broadway, New York, NY  10004<br>Attention:  William J. Honan<br>Tel No.:  212 513 3300<br>Fax No.: 212 385 9010 |
| If to Party B | Lennon, Murphy & Lennon, LLC<br>420 Lexington Avenue, New York, NY  10170<br>Attention:  Patrick F. Lennon<br>Tel No.: 212 490 6050<br>Fax No.: 212 490 6070 |
| If to the Escrow Agent | JP Morgan Chase Bank, N.A.<br>World Wide Securities Services<br>4 New York Plaza, 21st Floor<br>New York, New York  10004<br>Attention:  Michael Kuzmicz<br>Fax No.: 212-623-6168 |

*369922:v2 Form Basic Three Party Escrow Agreement    4*
*September 2007*

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 30 of 40
Case: 10-484    Document: 68-1    Page: 185    04/14/2010    24657    231

A-143

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (a), (b) and (c) of this Section 10, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth above is authorized or required by law or executive order to remain closed.

11.    **Security Procedures.**    In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on schedule 1 hereto ("Schedule 1"), and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated. Each funds transfer instruction shall be executed by an authorized signatory, a list of such authorized signatories is set forth on Schedule 1. The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. If the Escrow Agent is unable to contact any of the authorized representatives identified in Schedule 1, the Escrow Agent is hereby authorized to seek confirmation of such instructions by telephone call-back to any one or more of Party A or Party B's partners ("Partners") the Escrow Agent may select. The Escrow Agent may rely upon the confirmation of anyone purporting to be any such Partner. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Party A or Party B to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank. The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. The Parties acknowledge that these security procedures are commercially reasonable.

12.    **Compliance with Court Orders.**  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Escrow Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, entity, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

13.    **Miscellaneous.**   The provisions of this Escrow Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by the Escrow Agent and the Parties. Neither this Escrow Agreement nor any right or interest hereunder may be assigned in whole or in part by the Escrow Agent or any Party, except as provided in Section 6, without the prior consent of the Escrow Agent and the other parties. This Escrow Agreement shall be governed by and construed under the laws of the State of New York. Each Party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of New York. The Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Escrow Agreement. No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control. This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Escrow Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Escrow Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not

*369922:v2 Form Basic Three Party Escrow Agreement    5*
*September 2007*

Case 1:10-cv-05110-JSR     Document 1     Filed 07/02/2010     Page 31 of 40
Case: 10-484     Document: 68-1     Page: 186     04/14/2010     24657     231

A-144

invalidate or render unenforceable such provisions in any other jurisdiction. A person who is not a party to this Agreement shall have no right to enforce any term of this Agreement. The parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow

Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Escrow Agreement shall be enforced as written. Except as expressly provided in Section 8 above, nothing in this Escrow Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Escrow Agreement or any funds escrowed hereunder.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date set forth above.

Tax Certification: Taxpayer Identification Number (TIN): Social Security Number                    Date: December 24, 2007

or

Employer Identification Number

Name & Address:   Front Carriers Ltd.

c/o Golden Ocean Management A/S

P.O. Box 2005 Vika, NO-0125 Oslo, Norway

Customer is a (check one):

Corporation   X    Partnership___   Individual/sole proprietor___   Trust___
Limited liability company___   Enter the tax classification (D=disregarded entity, C=Corporation, P=Partnership___
Other___

Taxpayer is (check if applicable):

_X_ Exempt from backup withholding

Under the penalties of perjury, the undersigned certifies that:

(1)    the number shown above is its correct Taxpayer Identification Number for it is waiting for a number to be issued to it;

(2)    it is not subject to backup withholding because: (a) it is exempt from backup withholding or (b) it has not been notified by the Internal Revenue Service
(IRS) that it is subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified it that it is no longer subject
to backup withholding; and

(3)    it is a U.S. citizen or other U.S. person (defined in the Form W-9 instructions).

(If the entity is subject to backup withholding, cross out the words after the (2) above.)

Taxpayers who do not supply a tax identification number will be subject to backup withholding in accordance with IRS regulations.

(Note: The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup
withholding.

PARTY A

By:   Front Carriers Ltd.

Name:   William J. Honan

Title:   Attorney-In-Fact

369922:v2 Form Basic Three Party Escrow Agreement   7
September 2007

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 33 of 40
Case: 10-484    Document: 68-1    Page: 188    04/14/2010    24657    231

A-146

Tax Certification: Taxpayer Identification Number (TIN): Social Security Number        Date: December 2-Q 2007

or

Employer Identification Number

Name & Address:    Transfield ER Cape Ltd.

c/o Transfield ER Ltd.

Room 2538 Sun Hung Kai Center
30 Harbour Road, Wanchai, Hong Kong

Customer is a (check one):

Corporation __X__   Partnership____        Individual/sole proprietor____  Trust____
Limited liability company____   Enter the tax classification (D=disregarded entity, C=Corporation, P=Partnership_____
Other _____

Taxpayer is (check if applicable):

__X__ Exempt from backup withholding

Under the penalties of perjury, the undersigned certifies that:

(1)    the number shown above is its correct Taxpayer Identification Number for it is waiting for a number to be issued to it);

(2)    it is not subject to backup withholding because: (a) it is exempt from backup withholding or (b) it has not been notified by the Internal Revenue Service
(IRS) that it is subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified it that it is no longer subject
to backup withholding; and

(3)    it is a U.S. citizen or other U.S. person (defined in the Form W-9 Instructions).

(If the entity is subject to backup withholding, cross out the words after the (3) above.)

Investors who do not supply a tax identification number will be subject to backup withholding in accordance with IRS regulations.

Note: The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup
withholding.

PARTY $\cancel{E}$ B

By:    Transfield ER Cape Ltd.

Name:    Patrick F. Lennon

Title:    Attorney-in-Fact

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 34 of 40
Case: 10-484    Document: 68-1    Page: 189    04/14/2010    24657    231

A-147

## SCHEDULE 1

### Telephone Number(s) and authorized signature(s) for
### Person(s) Designated to give Funds Transfer Instructions

If to Party A:

| Name | Telephone Number | Signature |
|---|---|---|
| 1. William J. Honan | 212 513 3300 | |
| 2. | | |
| 3. | | |

If to Party B:

| Name | Telephone Number | Signature |
|---|---|---|
| 1. Patrick F. Lennon | 212 490 6050 | |
| 2. | | |
| 3. | | |

### Telephone Number(s) for Call-Backs and
### Person(s) Designated to Confirm Funds Transfer Instructions

If to Party A:

| Name | Telephone Number |
|---|---|
| 1. Michael J. Frevola | 212 513 3516 |
| 2. | |
| 3. | |

If to Party B:

| Name | Telephone Number |
|---|---|
| 1. Charles E. Murphy | 212 490 6050 |
| 2. | |
| 3. | |

Telephone call backs shall be made to both Parties if joint instructions are required pursuant to the agreement, All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer.

*369922:v2 Form Basic Three Party Escrow Agreement    9*
*September 2007*

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 35 of 40
Case: 10-484    Document: 68-1    Page: 190    04/14/2010    24657    231

A-148

**SCHEDULE 2**

**Escrow Agent's Compensation:**

The compensation for the Escrow Agent will be $2,500 per year without proration for partial years.

# 4979325_v3

*369922:v2 Form Basic Three Party Escrow Agreement*  10
*September 2007*

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 36 of 40
Case: 10-484    Document: 68-1    Page: 191    04/14/2010    24657    231

A-149

JPMORGAN CHASE BANK N.A.

as Escrow Agent

By:

Michael J. Kuzmicz
Vice President

Case 1:10-cv-05110-JSR     Document 1     Filed 07/02/2010     Page 37 of 40
Case: 10-484     Document: 68-1     Page: 177     04/14/2010     24657     231

A-135

## ESCROW AGREEMENT

WHEREAS, Front Carriers Ltd. ("Front Carriers") entered into a contract of affreightment with Transfield ER Cape Ltd. ("Transfield") on or about August 9, 2005 ("COA"), ("Front Carriers" and "Transfield" may be referred together as the "Parties" or individually as the "Party").

WHEREAS, disputes between the Parties have arisen under the COA which will be resolved either pursuant to the arbitration provision in the COA by the Chambre Arbitrale Maritime de Paris ("CAMP") or by a settlement agreement between the Parties.

WHEREAS, Front Carriers, to secure its claims, has attached the amount of $15,101,338.00 which amount is currently being held, pursuant to the order of U.S. District Judge Richard J. Sullivan, in various banks ("Banks").

WHEREAS, by an order dated November 16, 2007, Judge Sullivan ordered Front Carriers to post "a bond or other satisfactory security" in the amount of $5,210,280.00.

WHEREAS, the Parties wish (i) to establish two escrow accounts in a mutually agreed bank, (ii) to deposit the funds that were attached by Front Carriers in one account and the funds that are to be deposited by Front Carriers in the second account and (iii) to distribute all the funds including accrued interest and less any bank charges upon the final conclusion of the arbitration or the signing of a final settlement agreement in accordance with this Escrow Agreement ("Agreement").

NOW THEREFORE, the Parties agree as follows:

1.    The Parties will establish two interest bearing accounts in a mutually agreed bank, with an office in New York, New York, to receive the funds described in this Agreement.

2.    Front Carriers will cause a cease and desist letter to be sent to each of the entities to which attachment notices were served advising each entity that Front Carriers is discontinuing its maritime attachment against Transfield and Transfield ER Ltd. and requesting it to remove Transfield and Transfield ER Ltd. from its electronic screens or filters.  At the same time, the Parties will take such reasonable steps as are necessary or advisable to cause the Banks to release the funds that were attached by Front Carriers for deposit directly into one of the escrow accounts.  Once so deposited, the funds, including accrued interest and less any bank charges, shall be referred to as the "TF Funds" and the escrow account shall be referred to as the "TF Account."

3.    Upon the establishment of the escrow accounts, Holland & Knight LLP ("Holland & Knight") will deposit the amount of $5,210,280.00 into the other escrow account.  Once so deposited, the funds, including accrued interest and less any bank charges, shall be referred to as the "FC Funds" and the escrow account shall be referred to as the "FC Account."  The TF Funds and the FC Funds shall be referred to as the "Escrow Funds."

4.    The Escrow Funds are to be distributed upon the happening of the following events:

A.    If the Parties enter into a final settlement agreement, which the Parties agree will provide for the distribution of the Escrow Funds, the Escrow Funds will be distributed as set forth in the settlement agreement.

2

B.    If CAMP issues a final arbitration award and, after all appeals or, if no appeals are taken, after the time(s) to appeal have elapsed, the Escrow Funds will be distributed as follows:

(i)    If there is an award of a monetary amount to Transfield (which amount may include interest and costs, including attorneys' fees), the amount of such award up to the amount of the FC Funds then in the FC Account shall be distributed to Transfield with the remainder distributed to Front Carriers. If there is no monetary award to Transfield, the FC Funds shall be distributed to Front Carriers.

(ii)    If there is an award of a monetary amount to Front Carriers (which amount may include interest and costs including attorneys' fees), the amount of such award up to the amount of the TF Funds then in the TF Account shall be distributed to Transfield with the remainder distributed to Transfield. If there is no monetary award to Front Carriers, the TF Funds shall be distributed to Transfield.

C.    The distribution of the TF Funds and the FC Funds, unless otherwise ordered by a court, is to be accomplished only by two signatures, one of a member of Lennon, Murphy & Lennon LLC (or its successor firm) on behalf of Transfield and the other of a member of Holland & Knight LLP (or its successor firm) on behalf of Front Carriers.

5.    Transfield acknowledges and accepts that the execution of this Agreement and the deposit of $5,210,280 into escrow by Front Carriers complies with the order of Judge Richard J. Sullivan dated November 16, 2007 and, in particular, is deemed as "satisfactory security" as that term is used in that order.

6.    Lennon, Murphy & Lennon LLC and Holland & Knight LLP each are acting as an agent for its client in this matter and can be held responsible or liable for any losses arising out of or relating to this Agreement only if the loss arises solely out of its gross negligence or willful misconduct.

3

Case 1:10-cv-05110-JSR    Document 1    Filed 07/02/2010    Page 40 of 40
Case: 10-484    Document: 68-1    Page: 199    04/14/2010    24657    231

A-157

**JPMorganChase** 🟦

JPMORGAN CHASE BANK, N.A.
NORTHEAST MARKET
P O BOX 260180
BATON ROUGE  LA 70826-0180

**REDACTED**

October 01, 2009 -
October 30, 2009

**Page 1 of 1**

**Account Number**



00011318 CEN 802 3J 30409 - NNN T 1  000000000  C1 0000

FRONT CARRIERS LTD
JPM \AS E/A FOR FRONT CARRIERS/
TRANSFIELD ESCROW ACCT 2
ATTN WILLIAM J HONAN/FRONT CARRIERS LTD
C/O HOLLAND & KNIGHT LLP
195 BROADWAY
NEW YORK NY 10007-3100

**Customer Service**

If you have any questions
about your statement, please
contact your Customer Service
Professional.

## Cash Compensation Account

### Summary

| | Number | Amount |
|---|---|---|
| Opening Ledger Balance | | $15,347,954.60 |
| Deposits and Credits | 1 | $630.60 |
| Withdrawals and Debits | 0 | $.00 |
| Checks Paid | 0 | $.00 |
| **Ending Ledger Balance** | | **$15,348,585.20** |

### Deposits and Credits

| Ledger Date | Description | Amount |
|---|---|---|
| 10/01 | COMPENSATION ON PRIOR MONTH AVAILABLE BALANCE IN TRUST ACCOUNT WITH JPMORGAN CHASE BANK, N.A. TRN: YOUR REF: | $630.60 |
| **Total** | | **$630.60** |

### Daily Balance

| Date | Ledger Balance | Date | Ledger Balance |
|---|---|---|---|
| 10/01 | $15,348,585.20 | | |

Your service charges, fees and earnings credit have been calculated through account analysis.

Please examine this statement of account at once.  By continuing to use the account, you agree that: (1) the account is subject to the Bank's deposit account agreement, and (2) the Bank has no responsibility for any error in or improper charge to the account (including any unauthorized or altered check) unless you notify us in writing of this error or charge within sixty days of the mailing or availability of the first statement on which the error or charge appears.